Slip Op 07 - 154

# *UNITED STATES COURT OF INTERNATIONAL TRADE*

|  |  |  |
|---|---|---|
| | : | |
| MYLAND INDUSTRIAL, LTD. and | : | |
| MYLAND BUXIN (FOUNDRY), LTD., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Before: **MUSGRAVE, Senior Judge** |
| | : | Court No. 06-00447 |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| ANVIL INTERNATIONAL, INC. and | : | |
| WARD MANUFACTURING, INC., | : | |
| | : | |
| Defendants-Intervenor. | : | |

## OPINION

[On challenge to U.S. Department of Commerce's final results of antidumping duty review determination applying total adverse facts available to plaintiffs-respondents, results sustained.]

Decided: October 25, 2007

*Kittredge, Donley, Elson, Fullem & Embick, LLP* (*John P. Donohue* and *Theresa Huynh Lanzdorf*), for the plaintiff.

*Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Stephen C. Tosini*); Office of Chief Counsel for Import Administration, United States Department of Commerce (*Jonathan Zielinski*), of counsel, for the defendant.

*Schagrin Associates* (*Robert B. Schagrin*, *Brian E. McGill*, and *Michael James Brown*), for the defendant-intervenors.

Plaintiffs Myland Industrial Ltd. of Hong Kong, Special Administrative Region, People's Republic of China ("PRC") and Myland Buxin (Foundry) Ltd. of Foshan, PRC (collectively "Myland") challenge the final results of the second administrative review, the first in which they participated, of non-malleable cast iron pipe fittings from the PRC, as conducted by the U.S. Department of Commerce, International Trade Administration ("Commerce"), and published *sub nom. Non-Malleable Cast Iron Pipe Fittings from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 71 Fed. Reg. 69546 (Dec. 1, 2006) ("*Final Results*"). Myland's specific complaint concerns a determination to reject all data submitted by them and apply "total adverse facts available" as to Myland's antidumping duty margin. The government and the defendant-intervenors Anvil International, Inc. and Ward Manufacturing, Inc. argue that the *Final Results* should be sustained as is. For the following reasons, they must be.

## *Background*

On April 7, 2003, Commerce issued an antidumping duty order on non-malleable cast iron pipe fittings from the PRC bearing a country-wide antidumping duty rate of 75.5%. *Notice of Antidumping Duty Order: Non-Malleable Cast Iron Pipe Fittings from the People's Republic of China*, 68 Fed. Reg. 16765 (Apr. 7, 2003). On April 1, 2005, Commerce published a notice of opportunity to request administrative review of the order for the review period April 1, 2004 through March 31, 2005 ("POR"). *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation: Opportunity to Request Administrative Review*, 70 Fed. Reg. 16799 (Apr. 1, 2005). On April 25, 2005, Myland, as producer and exporter of, *inter alia*, gray iron electrical conduit fittings and ductile iron electrical conduit fittings from the PRC, timely requested administrative

review of their sales and exports.   Public Record Document ("PDoc") 1.  Of some significance to

the analysis of this proceeding is the unrebutted allegation that Myland was not initially subject to

the antidumping duty order but only became so as the result of an importer's request for a scope

determination, *see* 19 C.F.R. § 351.225, that was issued on or about November 5, 2004 and

retroactively applied to Myland's products entered from April 1, 2004.  *See* Pl.'s Reply at 1-2.

In the course of the administrative review, Commerce issued one three-part questionnaire and

four supplemental questionnaires.  Among other items, Commerce requested information from

Myland on the actual amounts of each raw material factor used in the production of its gray iron

electrical conduit fittings and ductile iron electrical conduit fittings.  *See generally*, *e.g.*, PDoc 6.

Commerce also requested reconciliation of reported cost information to the information Myland has

in its financial records.  *Id*. at D-23.  Myland responded to Commerce that 29 factors are used in

production including the main raw materials pig iron, ductile iron and scrap steel, but that it does not

maintain records related to materials consumption.  *Id*. at D-6–D-8.

Consumption is theoretically determined by examining opening materials inventory, adding

materials purchased during the period, and then subtracting the closing materials inventory.  Since

Myland did not maintain records useful for that exercise, it proposed to Commerce to use data for

purchase prices as a base and apply a "yield factor" using the weight of the raw material versus the

weight of the finished product to allocate costs to specific products.  *Id*. at D-7.  *See id*. at Ex. D-12.

Myland also stated that

> Buxin Myland has only income statements prepared; no other financial
> statements are prepared in the normal course of business. . . .  Buxin Myland
> manually records expenses such as raw material purchases and labor wages
> paid, in a traditional hand-written ledger and retains payment receipts and

> original purchase receipts and invoices. The ledger and supporting
> documentation are provided by Buxin to its accountants who then prepare
> income statements. Myland does not have an accounting software package
> but records its operating expenses and product purchases in spreadsheets,
> which it provides to its accountant to prepare financial statements.

PDoc 5 at A-15. Commerce then proceeded to ask Myland several questions in its supplemental

questionnaires concerning the total quantity of raw materials inputs, Myland's yield loss calculation,

scrap generation, allocation of raw material consumption rates, and the cost reconciliation of its

factors of production. *See* PDocs 19, 35, 43. Regarding material usage, Myland responded that "all

inputs used to manufacture subject product have been allocated over all products using that input[.]"

Confidential Record Document ("CDoc") 5 at SQR1-24. Myland also provided clarifying cost

reconciliations as requested. *See* PDoc 40 at SQR2-22–SQR2-23, CDoc 7 at Ex. S2-8.

Upon finding that Myland's cost reconciliation properly balanced, Commerce apparently

accepted Myland's proposed purchase-based methodology methodology and reported data and it

calculated a preliminary antidumping duty rate of 1.8% on that basis. *See Non-Malleable Cast Iron

Pipe Fittings from the People's Republic of China: Preliminary Results of Antidumping Duty

Administrative Review*, 71 Fed. Reg. 30116 (May 25, 2006).[1] Thereafter, the petitioners' post-

preliminary review comments brought to Commerce's attention a discrepancy in Myland's

purchases-based calculations. Specifically, the petitioners pointed out that some of Myland's

metallic inputs must not have been accounted for, because the weight of the materials inputs as

reported by Myland was 87.13% of the weight of the products cast, thus implying that the total

quantity of raw materials reported as consumed in production was less than the materials that should

---

[1] Myland notes that its margin was roughly equivalent to the margins found for the other exporters. *Cf.* 71 Fed. Reg. at 30121.

have been necessary, based upon the production information that had been submitted.  *See* PDoc 55 at 3.

      In response, Myland agreed that the "[p]etitioners are correct" and

> [a]s soon as this deficiency was brought to our attention, we contacted the producer and sought to determine the source of this anomaly.  We learned that in submitting the input information, *the producer omitted a small number of steel scrap purchases* in an amount that would account for the full deficiency identified by the [p]etitioners.  We will not characterize that finding in any greater detail, lest we be accused of submitting factual information after the time period for which submission of information has elapsed.  However, we will discuss the legal consequences of that deficiency in greater detail . . . .  Suffice it to state here that we have accounted for the anomaly; that the omission is minor as a matter of law and fact; and that it is correctable by an adjustment to the data already submitted.

PDoc 58 at 3 (italics added).

      The government avers that Myland omitted to report "more than half" of its purchases of scrap steel inputs.  Def.'s Br. at 8 (referencing PDoc 58 at 7).  Myland calculates the variance to have been approximately half that advanced by the petitioners, and it also noted to Commerce that the discrepancy must have been lower because ductile input quantities had been over-reported and some of those had been used in the production of gray iron products.  *See* PDoc 58 at 7 & n.1.  In any event, it appears that the discrepancy affected only one of the 29 raw material inputs by, at most (as argued by the petitioners), a variance of 12%.  *See* PDoc 55 at Ex. 1.  Myland's administrative brief then offered suggestions as to how Commerce might compensate for the missing materials purchase data.  *See* PDoc 58 at 3, 6-10.

      For the *Final Results*, Commerce agreed with the petitioners that the total reported input quantities for metallic materials were less than the total reported output quantities of the finished

pipe fittings and that Myland had failed to report certain production inputs and, as a result, failed to

submit an accurate and complete cost reconciliation.  71 Fed. Reg. at 69548.  Commerce therefore

determined that Myland had failed to report necessary information, had failed to submit an accurate

and complete cost reconciliation, and had failed to cooperate by not acting to the best of its ability.

Commerce then concluded that, because the cost reconciliation was implicitly defective, there was

"no information on the record that [could] be used to calculate an antidumping duty margin for

Myland."  Issues and Decision Memorandum for the *Final Results*, 71 ITADOC 69546 ("*Dec.*

*Mem.*") at 11.  Commerce assigned Myland the antidumping duty rate of 75.5%, the highest from

the proceeding, as "total adverse facts available."  This action followed.

### *Standard of Review*

Any determination, finding or conclusion of Commerce in an antidumping duty

administrative review must be set aside if unsupported by the substantial evidence on the record or

if not in accordance with law. 19 U.S.C. §§ 1516a(b)(1)(i), (a)(2)(i), (a)(2)(B)(iii).

### *Discussion*

Myland argues two reasons why the *Final Results* are not supported by substantial evidence

or are not in accordance with law: (1) Commerce erroneously applied the non-market economy

("NME") rate to Myland after having found Myland Buxin subject to neither *de facto* nor *de jure*

government control, and (2) Myland cooperated to the best of its ability but Commerce failed to

provide Myland with notice of and opportunity to correct deficiencies and/or could have used

information of record to calculate a rate for Myland.

I

Commerce's rebuttable presumption is that the country-wide rate applies to those enterprises owned or controlled by the NME entity, in this case the government of the PRC. *See* 67 Fed. Reg. 60214, 60217 (Sep. 25, 2002) ("In all NME cases, the Department makes a rebuttable presumption that all exporters located in the NME country comprise a single exporter under common government control, the 'NME entity.'"). For the *Final Results*, however, Commerce determined as a matter of fact that Myland Buxin operated free from government control. 71 Fed. Reg. 69546, 69548 (Dec. 1, 2006). Myland asks how it is that Commerce can nullify this finding on state control by assignment of the NME-wide rate. Pl.'s Br at 14 (referencing *Shandong Huarong General Group Corporation, et al. v. United States*, Slip Op. 03-135 (CIT Oct. 22, 2003), for the proposition that application of an NME-wide rate to an enterprise that is not controlled by the NME entity was unsupported by substantial evidence). Myland calls attention to the fact that in the preliminary review, Commerce found that:

–   the PRC continued to be a non-market economy and that a normal value calculation would be calculated using the surrogate values from a market economy country of comparable economic development and that it was capable of obtaining surrogate values from such a country;

–   the country of such comparable level of economic development was India and that the needed surrogate value information could be obtained from publicly available Indian sources;

–   the factors of production data furnished by Myland was sufficiently detailed that it could calculate a normal value using the plaintiffs factors of production and the Indian surrogate values for such factors;

–   Myland had submitted sufficient information to establish that it was free from both *de facto* government control and *de jure* government control and was

thus entitled to the separate assessment provided for by the statute and regulations;

–        Myland's data were clear enough to identify a date of sale for purposes of calculating an antidumping duty margin;

–        Myland's information was detailed enough to determine United States Price on the basis of export price methodology and there was sufficient data in the submissions to calculate such an export price.

Pl.'s Br. at 6-7 (referencing 71 Fed. Reg. at 30116-30120). Further, Myland contrasts the 75.5% rate as "the most punitive rate on the record," particularly in light of the 29.2% less-than-fair-value margin alleged in the original antidumping petition. *See Petition for Imposition of Antidumping Duties: Non-malleable Cast Iron Pipe Fittings from the People's Republic of China* (Feb. 21, 2002), at Ex. 24.

The government responds that the petition's 29.2% rate was superceded by new information obtained during the original investigation instituted from the petition, that for this review Commerce merely applied the highest lawful rate as total adverse facts available, and that the fact that it also happens to be the PRC-wide rate is irrelevant. Def.'s Br. at 17. It argues that as long as Commerce explains its reasoning, it is not unreasonable for uncooperative companies to receive the same rate as non-participating companies or for Commerce to assume that a respondent's participation in the administrative review is dictated by whether or not it would receive a higher or lower rate than the country-wide rate through participation. *Id.* at 16, 18 (referencing *Shandong Huarong Machinery Co. v. United States*, Slip Op. 07-4 (CIT Jan. 9, 2007)).

"Where Commerce correctly determines that a party has not cooperated to the best of its ability, Commerce may employ adverse inferences *about the missing information* to ensure that the

party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." Statement of Administrative Action accompanying Pub. L. 103-465, *as reprinted in* 1994 U.S.C.C.A.N. at 4199) (as emphasized in *Gerber Food (Yunnan) Co., Ltd. v. United States*, 29 CIT ___, ___, 387 F.Supp.2d 1270, 1287 (2005)). *See* 19 U.S.C. §1677e(b). Assuming, *arguendo*, that Commerce's application of total adverse facts available was not unlawful, this court is not persuaded that application of the PRC-wide rate rendered the administrative finding of corporate control independent of the PRC a nullity. The antidumping statute permits reliance upon "a final determination in the investigation" as an adverse inference. 19 U.S.C. § 1677e(b)(2). In this instance, the 75.5% rate was a final determination in the original investigation. *See* 68 Fed. Reg. 16765. The PRC-wide rate is essentially an "all others" rate, and the fact that it implicates the issue of state control does not negate the fact that it is a "final determination." Its application in this instance is distinguishable from *Gerber* to the extent this matter does not involve the rejection of information independently verified by Commerce. *Cf.* 29 CIT at ___, ___, 387 F.Supp.2d at 1272, 1279 (observing that Commerce had verified information and used it in calculating respondents' separate rates). In this instance, verification was neither requested nor conducted, and Myland does not otherwise inform the court that the application of an NME-wide rate as total adverse facts available to a company found independent of NME control was erroneous as a matter of law.

## II

Equally troubling to the court is whether Commerce was correct in applying total adverse inferences as a result of Myland's responses. The statutes provide that if necessary information is not available to complete the administrative proceeding, "facts otherwise available" must fill the gap.

19 U.S.C. § 1677e(a)(1).  *See*, *e.g.*, *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed.

Cir. 2003).  The burden is on Commerce to explain why the lack of certain information is significant

to the progress of the investigation.  *See Mannesmannrohren-Werke AG v. United States*, 23 CIT

826, 839, 77 F.Supp.2d 1302, 1313-14 (1999) (citations omitted); *accord*, *SKF USA Inc. v. United

States*, 29 CIT __, 391 F.Supp.2d 1327 (2005).

        In responding to a request for information, if a respondent promptly explains to Commerce

that it is unable to submit the information in the form and manner requested and suggests alternative

forms for submitting the information, Commerce is required to consider the reasonableness of that

response and modify its requirements so as to avoid unreasonably burdening the respondent.

19 U.S.C. § 1677m(c)(1).  Commerce is also directed to provide assistance to the extent practicable

to help respondents (particularly small companies) comply with information requests.  19 U.S.C.

§ 1677m(c)(2).  If a response to a request for information is noncompliant, Commerce must inform

the respondent about the nature of the deficiency and provide an opportunity "to remedy or explain"

the deficiency in light of the time limit for completing the review.  19 U.S.C. § 1677m(d).  If a

respondent acts to the best of its ability to provide information necessary to a determination and to

meet Commerce's requirements for such information, even if the information does not meet all such

requirements Commerce must still consider it if it is submitted timely, can be verified, is not

unreliable, and can be used without undue difficulty.  19 U.S.C. § 1677m(e).  *Cf.* 19 U.S.C.

§ 1677m(d) (a "not satisfactory" or untimely response to a deficiency notice may result in Commerce

disregarding all or part of the original and subsequent submissions) *with*, *e.g.*, *Borden, Inc. v. United

States*, 22 CIT 233, 263, 4 F.Supp.2d 1221, 1246 (1999) (satisfaction of criteria of subsection (e)

curtails discretion to find submission "not satisfactory" pursuant to subsection (d)).  But, if a respondent withholds information or fails to provide it timely in the form or manner requested or "significantly" impedes the proceeding or provides information that cannot be verified, then Commerce "shall" resort to facts otherwise available.  19 U.S.C. § 1677e(a)(2).  Further, if it is determined that a respondent did not act to the best of its ability to comply with a request for information, the respondent may receive an adverse inference when Commerce selects from facts otherwise available.  19 U.S.C. § 1677e(b).

This best-of-its-ability standard asks whether the respondent has "put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation[.]" *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  An adverse inference is not to be "drawn merely from a failure to respond[,]" it must arise "*only* under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made, *i.e.*, under circumstances in which it is reasonable to conclude that less than full cooperation has been shown."  *Id.* (italics added).  *Cf. Olympic Adhesives v. United States*, 899 F.2d 1565 (Fed. Cir. 1990) (under predecessor to facts available statue, a failure to comply with a request for information must be evaluated in the context of the request before an adverse inference may arise).

In this instance, in the preliminary proceeding Myland promptly notified Commerce that it was unable to submit the information in the form and manner requested and suggested alternative forms for submitting the information, which Commerce then considered via four supplemental questionnaires.  Before Commerce uses a respondent's cost allocation methodology, Commerce must ensure that the reported costs capture all of the costs incurred by the respondent in producing the

subject merchandise. *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Prestressed Concrete Steel Wire Strand from Mexico*, 68 Fed. Reg. 68350 (Dec. 8, 2003) ("*Wire Strand from Mexico*"), Dec. Mem. at cmt. 6. The cost reconciliation "assures [Commerce] that the respondent has accounted for all costs before allocating those costs to individual products" and thus serves as the starting point for verifying the accuracy of a respondent's reported costs. *Notice of Final Determination of Sales at Less Than Fair Value, and Negative Final Determination of Critical Circumstances: Certain Lined Paper Products from India*, 71 Fed. Reg. 45012 (Aug. 8, 2006) ("*Paper from India*"), Dec. Mem. at cmt. 14. *Cf.* 19 U.S.C. § 1677m(i). Because of its importance, Commerce has applied total adverse facts available when a proper cost reconciliation is not provided. *See Paper from India*; *Wire Strand from Mexico*.

The crux of the matter here appears to have been that Myland had "no cost accounting system, kept no cost control reports, and has no records that would allow it to identify the raw material inputs used in production" and thus "the sole basis in this review for identifying the accuracy of the reported inputs used in production is Myland's cost reconciliation of its purchases to its audited financial statements." *Dec. Mem.* at 11. Myland's cost reconciliation "reconciled" manufacturing costs to Myland's financial statements for purposes of the preliminary determination; hence, at the time the preliminary results were issued, Commerce had no basis for concluding that the cost reconciliation was deficient. However, by the time of the *Final Results*, the cost reconciliation had been shown to be inaccurate because it had failed to take into account a significant

quantity of materials purchases, and reliance upon materials purchases was the prime factor supporting Myland's methodology.

The government states that Commerce did not test the cost reconciliation because it did not conduct "verification" (which the court interprets to mean "on-site" verification, *cf.* 19 U.S.C. § 1677m(i)), and it argues that the lack thereof does not affect Commerce's finding that the cost reconciliation is inaccurate, since a test is unnecessary to confirm its failure. Given such a failure, the government argues, it was not possible to use some of Myland's reported factors of production and apply adverse inferences to others "because, as a result of the inaccurate cost reconciliation, there was no information upon the record supporting the accuracy of any of Myland's reported factors." Def.'s Br. at 15. In other words, "Myland failed to report its information completely, [and] the extent of Myland's failure to cooperate is not known." *Id*. at 13.

Strictly as a matter of accounting logic, that would appear to be inarguable. However, by the same token there is nothing else in the record to detract from or undermine the veracity of Myland's factors of production data as reported, except for the matter of the missing scrap metal data.

Myland argues the issue here "is not a question of the information being 'withheld,' it is a case of the information not being known[,]" which happens "regularly" in antidumping proceedings. Pl.'s Reply at 13 (referencing *Certain Malleable Iron Pipe Fittings from the People's Republic of China, Final Determination of Sales at Less Than Fair Value and Critical Circumstances*, 68 Fed. Reg. 61395 (Oct. 28,2003) ("*Malleable*")).[2] On the other hand, Myland's post-preliminary review

---

[2] Myland elsewhere also complains that by the time of the preliminary results, the petitioners had "sat on" their allegation of discrepancy for months and were able to calculate to the kilo the amount of the alleged discrepancy. That may be true, but the responsibility for providing complete information in response to the original request ultimately rested with Myland.

comments do not shed light on whether that was actually the case, specifically why the missing information had not been provided in response to such request. *See* PDoc 58 at 3 (quoted *supra*). *Cf. Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353-54 (Fed. Cir. 2006) (not unlawful to require more than "mere" clerical error to be corrected after preliminary results issued). Rather, they indicate that Myland concluded that it was precluded from submitting the missing information by that time, *cf.* 19 U.S.C. § 1677m(g) (requiring disregard new factual information provided with final-opportunity comments on information gathered up to point where Commerce must cease information gathering prior to making a final determination), and that Myland was apparently able to immediately verify the extent of the missing information and argue as to what facts available on the record might substitute for it.

At this stage, Myland argues once Commerce discovered the information deficiency, Commerce was obliged, pursuant to 19 U.S.C. § 1677m(d), to permit Myland a remedial opportunity. The statute, however, requires that Commerce permit a party the opportunity "to remedy or *explain*" the deficiency. Myland's post-preliminary rebuttal brief apparently attempted to do just that, *i.e.*, take advantage of the opportunity to explain. On the basis of Myland's post-preliminary review comments, the court is unable to hold that it was unreasonable for Commerce to have concluded therefrom that Myland had "withheld" necessary information within the meaning of 19 U.S.C. § 1677e(a)(2)(A), or had timely failed to provide necessary information within the meaning of 19 U.S.C. § 1677e(a)(2)(B), and had therefore shown less than full cooperation and not acted to the best of its ability to provide the requested information earlier in the proceeding. *See Nippon Steel Corp v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (the best-of-one's-ability

standard does not condone "inattentiveness, carelessness or inadequate record keeping"). *Cf. Shandong Huarong Gen. Group Corp. v. United States*, 27 CIT 1568, 1590-91 (holding that drawing an adverse inference was not unreasonable where the respondent had eventually produced requested records) *with* PDoc 58 at 3 (as quoted *supra*). The court is therefore unable to conclude that Commerce was unreasonable in regarding Myland's admitted omission of steel scrap among its reported metallic inputs as affecting the reliability of all of Myland's reported factors of production, with the result that Commerce rejected Myland's submitted data in their entirety, because acceptance of those data had depended upon the reliability of cost reconciliation as a starting point for verification. Although Myland distinguishes the *Paper from India* and *Wire Strand from Mexico* determinations as involving cost reconciliations that "were not only inadequate [but] were so inadequate as to be unusable[,]" Pl.'s Reply at 8, those instances are distinguishable in that Commerce had proceeded to conduct verification of the affected respondents and did not rely solely on cost reconciliation methodology as an assurance of accuracy. The same cannot be said of the matter at bar.

Obviously the remedy Commerce applied in this instance stands in stark contrast to the facts-available remedy applied in the *Malleable* decision.[3] The difficulty here, however, is in understanding why a purported cost reconciliation would have "reconciled" in the first place if certain materials purchase information had been omitted therefrom. Myland speculates that the discrepancy in the under-reported raw materials amounted to a variance of 5.59% of the total cast

---

[3] Commerce cannot impose pursuant to 19 U.S.C. § 1677e(b) an "unjustifiably high, punitive rate" that ignores facts discovered in the course of its own investigation. *See F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States,* 216 F.3d 1027, 1033 (Fed. Cir. 2000).

weight of finished product or 82.9 metric tons, *i.e.*, "a single shipment of material," that could have been simply "overlooked and not recorded, as a clerical error," and that such "would be found equally as well in the reconciliation." Pl.'s Reply at 10. Myland appears to be arguing that the same error affected both sides of the equation. If that is so, then it would only tend to cast doubt on the reliability of Myland's financial statements. *Cf.* PDoc 6 at D-24 ("Buxin has prepared a reconciliation of the reported inputs of production for the POR and there [*sic*] corresponding values to its audited financial statements for the POR.").

Ultimately, verification was neither requested nor conducted for Myland, but Myland neither argues that cost reconciliation in place of verification was unlawful, *cf.* 19 U.S.C. § 1677m(i), nor points to other information of record that would substitute for testing the reliability and accuracy of the information pertaining to the other 28 factors of production. Commerce attempted to use Myland's methodology, but in the end found that it could not and determined that the responsibility for that failure rested with Myland. Substantial evidence supports that determination and therefore legally supports the adverse inference permitting selection of the draconian margin that resulted. That being the case, the Court is without authority to substitute its own judgment of the matter.

### *Conclusion*

Commerce's determination to apply total adverse facts available to data for Myland in the *Final Results* will therefore be sustained.

/s/  R. Kenton Musgrave
R.  KENTON MUSGRAVE, SENIOR JUDGE

Dated: October 25, 2007
        New York, New York

# UNITED STATES COURT OF INTERNATIONAL TRADE

——————————————————
                                               :
MYLAND INDUSTRIAL, LTD. and                    :
MYLAND BUXIN (FOUNDRY), LTD.                    :
                                               :
                   Plaintiffs,                 :
                                               :
           v.                                  :        Before: **MUSGRAVE, Senior Judge**
                                               :        Court No. 06-00447
UNITED STATES,                                 :
                                               :
                   Defendant,                  :
                                               :
           and                                 :
                                               :
ANVIL INTERNATIONAL, INC. and                  :
WARD MANUFACTURING, INC.,                      :
                                               :
                   Defendants-Intervenor.      :
——————————————————                             :

## JUDGMENT

This action having been submitted for decision, and the Court, after due deliberation, having rendered a decision herein; now, therefore, in conformity with said decision, it is hereby

**ORDERED, ADJUDGED AND DECREED** that the administrative determination *Non-Malleable Cast Iron Pipe Fittings from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 71 Fed. Reg. 69546 (Dec. 1, 2006) compiled by the U.S. Department of Commerce, International Trade Administration, be, and it hereby is, sustained in its entirety with respect to Plaintiffs; and it is further

**ORDERED** that all other issues having been decided, this matter is concluded.

                              /s/  R. Kenton Musgrave
                    R. KENTON MUSGRAVE, SENIOR JUDGE

Dated: October 25, 2007
       New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                              Deputy Clerk